**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| | **Case No: 1:18-CR-00375-RC-1** |
| **v.** | |
| | **The Hon. Rudolph Contreras** |
| **JUSTICE SUH,** | |
| | **Sentencing Date: April 17, 2019** |
| **Defendant.** | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Justice Suh never expected to be standing before the Court as a criminal defendant. This case is truly out of character for a young man who is otherwise known as a devoted older brother, gifted computer science student, and Eagle Scout. As the powerful letters attached to this Memorandum attest, Mr. Suh, at age 23, has already overcome many obstacles to grow into the community-minded person that he is today. While his conduct and felony conviction in this case represent another challenge, he has accepted full responsibility and shown a keen determination to move forward with his life.

Over the past ten months, Mr. Suh has done everything he can to prove that his conduct in this case was a youthful aberration and that he will never again be before the Court. Although this case was born out of careless, juvenile actions, Mr. Suh's proactive response has shown great care and maturity. Since the FBI showed up at his doorstep in June 2018, Mr. Suh has fully cooperated with law enforcement, engaged in regular counseling, and completed over 600 hours of community service, in addition to his part-time job. In addition, even before signing the Plea Agreement, Mr. Suh wrote a lengthy apology to the victim in this case and paid full restitution. In short, Mr. Suh has already complied with all of the conditions that would typically be imposed by the Court at Setencing.

## ARGUMENT

As the Court is aware, *United States v. Booker*, 125 S. Ct. 738 (2005), rendered the United States Sentencing Guidelines advisory in order to remedy the Sixth Amendment violation that resulted from a mandatory Guidelines system. The applicable advisory Guidelines range now is merely one factor that the Court must consider when imposing sentence, and the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-597 (2007). The Court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. *See* 18 U.S.C. § 3553(a). As discussed below, the advisory Guidelines range in this case far exceeds a level that is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing when one considers the unique circumstances of this case and the characteristics of Mr. Suh. Indeed, the Government has asked for a sentence of six months probation, and the Presentence Report identified a downward variance from the applicable Guideline range. Based on the history and characteristics of Mr. Suh, the nature and unique circumstances of his offense, and the objectives of federal sentencing, Mr. Suh asks the Court to reject the advisory Guidelines range in this case as excessive and to impose a brief probationary sentence.

### I. The Advisory Sentencing Guidelines Range

The first step in post-*Booker* federal sentencing requires the Court to calculate the applicable advisory Guidelines range. *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008) (citing *Gall*, 128 S. Ct. at 596). Mr. Suh does not dispute that his advisory Guidelines range is, as stated in the Presentence Report ("PSR"), six to 12 months. PSR ¶ 73.

Identifying the applicable advisory Guidelines range is only the first step. Although the Court "must include the Guidelines range in the array of factors warranting consideration" as it determines an appropriate sentence under § 3553, *United States v. Kimbrough*, 128 S. Ct. 558, 564 (2007), it is also the Court's important prerogative to decide independently how much persuasive authority the advisory Guidelines range should receive in a particular case. In *Kimbrough*, the Supreme Court made clear that the broad discretion district courts possess in post-*Booker* federal sentencing includes the authority to question whether a Guideline truly reflects the sentencing considerations contained in § 3553(a). *Kimbrough*, 128 S. Ct. at 575. Independent scrutiny of the applicable Guidelines range is particularly appropriate when the Guideline at issue "do[es] not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role" of formulating Guidelines using an empirical approach based on data about past sentencing practices. *Id*. at 567, 575. In *Kimbrough* itself, for instance, the Supreme Court found that the 100-to-1 weight ratio employed in the Guidelines for drug-trafficking offenses involving crack and powder cocaine "did not take account of empirical data and national experience." *Id*. at 575 (internal quotation marks and citation omitted). The Court upheld a district court's decision to sentence below the advisory range in that crack cocaine case based on its determination that the Guidelines "[drove] the offense level to a point higher than [was] necessary to do justice." *Ibid*. (internal quotation marks and citation omitted).

## II. <u>The Other § 3553 Factors</u>

Section 3553 requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing. 18 U.S.C. § 3553(a). Those four purposes are the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford

adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires district courts to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7). For the reasons that follow, Mr. Suh submits that a downward variance from the advisory Guidelines range to a sentence of supervised probation is warranted in this case.

A. *The Nature and Circumstances of Mr. Suh's Offense*

On November 30, 2018, Mr. Suh executed a Plea Agreement with the Government. Mr. Suh agreed to enter a pre-indictment plea to a criminal Information charging him with one felony count of computer fraud, in violation of 18 U.S.C. § 1030(a)(5)(A). On February 1, 2019, Mr. Suh entered his guilty plea before the Court. As described in the Statement of Offense, Mr. Suh's criminal conduct involved two episodes of computer "hacking" against Students of Georgetown, Inc. (also known as "The Corp"), a Georgetown undergraduate student organization in which Mr. Suh was very involved. In the first incident, Mr. Suh briefly posted online the login credentials that fellow student-employees used to access The Corp website. In the second incident, Mr. Suh temporarily "deleted" The Corp's Google Suite cloud storage and deactivated multiple student-employee accounts.

Unlike many cases charged under this statute, Mr. Suh's actions were not for financial gain, nor to benefit from confidential business information. Instead, Mr. Suh's criminal conduct was his own (very misguided) way of expressing frustration with the leadership of a student organization that he cared deeply about.

1. *Background of Mr. Suh's Work as a Student Employee for "The Corp"*

Mr. Suh started working for The Corp's Information Technology ("IT") Department in October 2015, the fall of his freshman year. A homeschooled computer enthusiast, Mr. Suh found that the IT Department was the first place on campus where he could fit into college social life. By all accounts, he was a hard-working and loyal employee. He devoted hundreds of hours – including weekends and school vacations – to Corp IT projects and quickly worked his way up the student leadership ladder.

Mr. Suh devoted most of his non-academic time to The Corp and, when faced with budget pressure from the Upper Management, often worked for free. Historically, there have differences between The Corp's Directors and the IT Department because of diverging views over project and funding priorities. From Mr. Suh's perspective, The Corp's Upper Management tended to be very demanding of IT – requesting new projects on a whim. Added to that, the frequent changes in student leadership meant that each new management group would cancel projects in which IT was already heavily invested.

When Mr. Suh became the student Director of IT in March 2017, he hoped to change that dynamic and was vocal in sharing his many frustrations with the other Corp student Directors. Mr. Suh felt that the other Directors were not receptive to his input. In one instance, around the time Mr. Suh became Director of IT, he gave up his entire spring break to stay on campus and work around the clock on a new software program for The Corp's Management. Later that

spring, the new student leadership canceled the entire project without even acknowledging all of the work that had been invested by IT. As a result, he became increasingly frustrated with the lack of attention to important IT issues.

2. *May 2017 Pastebin Incident*

The May 2017 Pastebin incident was triggered out of Mr. Suh's frustration with The Corp's Upper Management and to try to show them how The Corp's systems would become increasingly vulnerable if IT was not allowed to work on important projects. As Mr. Suh acknowledged to the FBI, he used his "hacking" skills to capture the passwords that many of his student colleagues used to log into The Corp employee website. He then created a post on the website www.pastebin.com with a list of the students' georgetown.edu email addresses and corresponding passwords. Mr. Suh then sent a link of the pastebin.com post to The Corp's master email distribution list using a fake email address.

Mr. Suh acknowledged all of this conduct in his first interview with the FBI. It is important to note, however, that Mr. Suh did not label the post and did not indicate the website or organization to which the login information was linked. It is unclear whether the post was ever made fully available to the public. Even if it was, the post was online for less than 24 hours and was one of hundreds of thousands of pieces of text posted on the Pastebin website every day. There is no indication that any of the information posted was viewed by people outside of the The Corp community, copied, or used for any criminal purpose.

3. *Personal Pressures in Late 2017 and Early 2018*

Around the same time as the Pastebin incident, Mr. Suh's family began to experience an extremely difficult period due to a series of serious mental health issues involving Mr. Suh's younger brothers. As discussed in greater detail below, Mr. Suh eventually took a personal leave

of absence from Georgetown University in order to help care for his siblings. The leave of absence meant that Mr. Suh had to make the difficult decision to resign as IT Director of The Corp – the role that he had worked so hard to achieve.

When he returned to campus full-time for the Spring 2018 semester, Mr. Suh was very concerned with the new leadership and its negative impact on The Corp's IT Department. Justice felt that the new student Upper Management would often belittle the first and second-year employees, many of whom were struggling to find their place on campus. After seeing first-hand the mental health impact of school pressures on his two younger brothers, Mr. Suh greatly sympathized with IT underclassman at The Corp. Mr. Suh observed that the management frequently put lower-level IT students in very stressful situations, but did not deal well with such pressure themselves. Those frustrations, coupled with the pressures of his personal life, finally reached a breaking point on March 21, 2018. That evening, Mr. Suh, without any planning, initiated a series of computer processes intended to prank and frustrate The Corp's leadership.

*4. March 2018 Google Suite Incident*

Mr. Suh directed his disruption on March 21, 2018 to The Corp's Google's Suite (or "G Suite"). The Corp used Google Suite to assist with the organization's operations, including schedules, handbooks, policy documents, and some email support. It is important to note that the G Suite did *not* contain any Accounting, Audit, Financial, and Human Resources files. As Mr. Suh knew, those more secure, confidential files were saved on a network drive, which he did not touch.

Over the course of several hours, Mr. Suh sporadically accessed The Corp's Google Suite, randomly disrupting different aspects of the system. He changed the administrator passwords, disabled multiple user accounts, and temporarily deleted the files stored in the G

Suite cloud. Although Mr. Suh disrupted The Corp's IT system, he made sure that none of his actions would cause permanent damage and that all of the "deleted" data could be easily and quickly restored. As reflected in the Statement of Offense and clearly indicated on the Google Suite website, Google maintains a full back-up copy of all "deleted" G Suite user accounts and files for 20 and 25 days, respectively. "Deleted" accounts and files, even "permanently deleted" data, can be restored with single click of the G Suite "Restore" button. Indeed, The Corp was able to fully restore the system less than 24 hours after Mr. Suh began his ill-conceived sabotage.

Mr. Suh's hacking had the intended effect of causing significant short-term stress to The Corp's student leadership when they learned of the issues with the G Suite. To make matters worse, Mr. Suh continued to meddle with the system when The Corp leadership came to him for help. When confronted by his peers and the Metropolitan Police Department the following day, Mr. Suh denied any involvement in the G Suite issues. In June 2018, when questioned by the FBI, Mr. Suh fully confessed to his conduct. Since then, he has shown that he understands the seriousness of his offense and will do everything in his power to make amends.

The Court's statutory directive in this sentencing proceeding is to consider not only the "nature" of the offense of conviction as an abstract matter, but also the real-life "circumstances" of it as a concrete matter. *See* 18 U.S.C. § 3553(a)(1). The mitigating circumstances of Mr. Suh's offense simply could not be more compelling. As described in greater detail below, Mr. Suh suffers from a rare genetic disorder called Joubert Syndrome. This has affected Justice's emotional development and his interactions with others. A Psychological Evaluation of Justice Suh by Dr. Michael Hendricks reached the following conclusion:

> From all of the available data gathered for this evaluation, a few points that directly relate to Mr. Suh's behavior emerge. First, it is clear that, ***as a complication of Joubert Syndrome, he suffered severe developmental delays and***

> ***that while he has more than overcome the intellectual delay, he still struggles with physical and emotional delays*….**
>
> He described the frustration that precipitated each of the three actions that he took against the Corp, and ***in each instance, it is clear that he acted impulsively and with a level of emotional immaturity that one might expect of a high school student***. As noted above, this is likely where he was in his emotional development at the time that these events occurred.

Psychological Evaluation Report by Dr. Michael Hendricks (September 2, 2018), attached hereto as Exhibit A.1.

B. *The History and Characteristics of Mr. Suh*

The history and characteristics of Mr. Suh also support a downward variance from the advisory Guidelines range to a probationary sentence. Indeed, the Presentence Report concluded that there is a prominent factor in Mr. Suh's life "that would warrant a variance from the applicable guideline range." Namely, "the defendant suffers from Joubert Syndrome, a condition that has affected both his physical and emotional development." PSR ¶ 93.

1. *Childhood Struggles and Joubert Syndrome*

From birth, Mr. Suh suffered severe developmental delays. He did not speak until he was almost five years old. As a result, Mr. Suh did not receive a genetic diagnosis for his symptoms until later in life and therefore received only certain types of therapy. His parents held him back from starting school to undergo intense physical, occupational, and speech therapy, but he was not provided with psychological counseling.

All of Mr. Suh's hard work in cognitive therapy paid off and by the time he reached high school, he had more than caught up with his class. Despite his academic strengths, Mr. Suh still suffered from continued physical and mental health issues. After suffering years of unexplained symptoms, Mr. Suh was finally diagnosed as a teenager with Joubert Syndrome, a rare genetic disorder. Although this does not define him, Joubert Syndrome has, and will always, affect Mr.

Suh's life. Mr. Suh continues to regularly see specialists to monitor retinal, renal, liver, systemic/motor, and other neurological abnormalities. Many children with Joubert do not progress to become fully-functioning adults. It is a credit to Mr. Suh's character and hard work that, through years of intensive occupational therapy, he has been able to overcome or adapt to many of the symptoms of his disorder to become an independent young man.

While Mr. Suh has been able to thrive, he still experiences visible manifestations of his disorder, including major tics of the head, abnormal eye movements that require wearing special glasses, an irregular gait that is caused by his motor tic (causing him to have to compensate for sudden 90 degree turns of his head), and poor motor coordination. *See* Psychological Evaluation Report by Dr. Michael Hendricks (September 2, 2018), attached hereto as Exhibit A.1. Due to these abnormalities, Justice has routinely dealt with the social and emotional effects of being different than his peers. To no fault of his own, Justice's capability to handle emotional and social issues is significantly delayed.

He started his freshman year at Thomas Jefferson High School in Virginia, but did not fit in well with the other students. His family made the decision that Mr. Suh would be home-schooled for the remainder of high school.

> This meant that ***he was now removed from the normal social world of high school, where many important tasks of emotional development are achieved***. At the same time, it allowed Mr. Suh to pursue a fuller reach for his intellectual development. In essence, ***while his intellectual development continued to be attended to, no comparable attention to his emotional development occurred during these three years.***
>
> It is perhaps at least in part for this reason that he found himself drawn to computers and information technology. In this world, which occurs mostly online, his physical disability would be virtually irrelevant… At the same time, ***by retreating into online interactions, there is little demand placed on individuals to hone their emotional development***.

Psychological Evaluation Report by Dr. Michael Hendricks (September 2, 2018), Exhibit A.1 (emphasis added).

2. *Younger Siblings' Mental Health Issues*

Throughout 2017 and 2018, Mr. Suh spent extensive time away from his college life to be the lead support person for two of his younger brothers who both suffered from a series of serious mental health issues (as described in greater detail in the Presentence Report and attached Letters). *See, generally,* Letters from Suh family, attached hereto as Exhibit B. These episodes would be emotionally traumatic for anyone, but they had an especially devastating impact on Mr. Suh given his young age, personal struggles, and lack of professional support.

3. *Work Ethic and Achievements*

One of the consistent themes in the attached Letters of Support is Mr. Suh's unfailing work ethic – from his grueling occupational therapy as a child to his recent roles as a student and part-time IT professional. Despite the challenges of his Joubert Syndrome, Mr. Suh achieved the rank of Eagle Scout. He took college-level classes at a young age and earned admission to Georgetown University. He was a well-regarded student, and served as a Teaching Assistant for a number of his computer science classes. As one of his professors writes:

> Justice displays confidence, compassion, and intelligence in his interactions with peers. He is the first to rise to the defense of friends and strangers who may be bullied. He is the first to encourage fair play and right conduct when faced with moral ambiguities….
>
> It was a total shock to hear about his actions and his departure from Georgetown, as this behavior was so out of character for him. But, he was honest and forthright about what had happened, and he expressed deep remorse for the mistakes in judgment. His life and his potential accomplishments have already been deeply wounded by the consequences of a felony plea, but I remain hopeful. He has already focused his attention to making amends, learning to better understand his own actions, and taking his many talents and using them for good through community service. His inherent strengths and his moral character remain unchanged, and these will carry him through to the next stage of his life.

Letter of Professor Robert W. Carr, attached hereto as Exhibit C.1.

In addition to Mr. Suh's compelling personal characteristics, he has completed substantial remedial measures to make up for his conduct. While most defendants wait to complete community service and pay restitution when they are ordered to do so by the Court, Mr. Suh has proactively done both. Over the past ten months, he has completed hundreds of hours as a volunteer Administrative and IT Assistant at the Northern Virginia Family Service, a nonprofit organization that provides occupational, mental health, and legal services to thousands of people in the local community.

> Justice Suh has been a stand-out volunteer at NVFS since August 2018. He came will a willingness to volunteer in any administrative capacity necessary and proved his dedication, dependability and flexibility from the start. ***He was committed, volunteering an average of 30- 35 hours per week and totaling over 620 hours*** in his eight months with us.
>
> Justice is hard-working and genuinely cares about doing a good job. He did coding and set up applications that automated many processes for our IT department, significantly improving the department's efficiency and productivity…. ***Justice's knowledge, support and enthusiasm to achieve success has truly made a lasting significant impact for NVFS's administrative infrastructure***. Justice has matured over the last six months and appears very ready to leave past mistakes behind and move forward with his life. He clearly demonstrates the motivation and initiative to push through challenges to achieve his goals.

Letter from Karen Horowitz, Director of Community and Volunteer Engagement at Northern Virginia Family Services, attached hereto as Exhibit C.2 (emphasis added).

Mr. Suh also reached out (through counsel) to the victim in this case, Students of Georgetown, Inc., ("The Corp") with an apology letter and payment of full restitution ($10,695.52). *See* Apology Letter from Justice Suh, attached hereto as Exhibit D. Lastly, as explained in the attached psychological evaluation and counseling letters, Mr. Suh has, for the

first time in his life, entered into counseling. Through these remedial actions, he has not only shown complete remorse, but that he is capable of full rehabilitation.

C. *The Kinds of Sentences Available*

The Government has asked the Court for a six month probationary sentence. Mr. Suh's Sentencing Guideline range is in Zone B of the Sentencing Table, such that the minimum term under the Guidelines may be satisfied by imprisonment or a sentence of probation. *See* USSG §5C1.1(c). *See* PSR at 14.

1. *Employer Notification Requirement*

The Court has asked the parties to address whether it should impose upon Mr. Suh a requirement that he notify future employers of the instant conviction. This analysis turns upon whether such a notification is "reasonably necessary to protect the public from further crimes of the defendant" and "may not be imposed to any greater extent than reasonably necessary to achieve that purpose." *United States v. Doe*, 79 F.3d 1309, 1321 (2d Cir. 1996) (analyzing relevant legislative history for § 3263(b)(6)); *see also United States v. Kelly*, 2017 WL 4405043, at *3 (D.D.C. Sept. 11, 2017), *report and recommendation adopted*, 266 F. Supp. 3d 92 (D.D.C. 2017) (collecting cases). As discussed above, Mr. Suh poses no risk to the public. His actions were isolated and born out of a moment of emotional immaturity in the context of a college student organization. More to the point, there is no evidence that he may commit "further crimes."

This positions Mr. Suh in stark contrast to defendants that have had an employer notification requirement imposed. For example, in *United States v. Schechter*, 13 F.3d 1117 (7th Cir. 1994), a computer consultant that plead guilty to income tax evasion argued that he should not have to alert employers to his conviction. *Id.* However, the court disagreed, noting that he

had three previous cases involving theft from previous employers, thus demonstrating that "almost everywhere he has gone in an employment situation ... [he] finds some way to flim-flam his employer." In *United States v. Chan*, 2018 WL 3031853 (D. Conn. June 19, 2018), the CFO defendant argued that should not be subject to an employer notification requirement in his conviction for embezzling hundreds of thousands of dollars because, unlike the typical case, he has no criminal history. *Id*. at *2, *7. But the court concluded that he still posed a risk because, by his own admission, he spent decades as an "inveterate gambling recidivist, and it is the gambling that consumes him and deludes him into stealing money to satisfy his addictive desires." *Id*. at *7.

Mr. Suh is different. Unlike the defendants who have been subject to an employer notification requirement, he neither has a criminal history, nor is there any indication of compulsive behavior. Rather, he committed an isolated offense, that was circumscribed in scope, and for which he has already begun to atone. Such facts cannot reasonably support an articulable risk of him committing "further crimes." Indeed, Mr. Suh's current and former employers have each written letters extolling his talents in information technology and expressing their hope that he is still able to follow his career path *See, generally*, Academic and Professional Letters, attached hereto as Exhibit C. Most compelling are the words from Eric Wittreich, CEO of Ridgeline International, where Mr. Suh worked as an intern.

> Mr. Suh has also shown himself to be a trustworthy, reliable, and fundamentally good person. ***While an intern at the company, we entrusted him with our proprietary technology and equipment. In response, he displayed nothing but integrity, rigor, and professionalism*** during his employment by our company. If Mr. Suh were to rejoin Ridgeline or one of its affiliates, I would have no hesitancy entrusting him with our equipment and important company projects again. Indeed, ***I hope that we will be able to employ Mr. Suh again after he obtains his degree. I would employ a hundred of him if I could.***

> In short, I am confident that Mr. Suh has a promising future with many great opportunities ahead. While he has clearly made some mistakes in his actions which led to this case, I am confident that he will learn from them and that in the future he will use his strong computer abilities to make a positive impact on society. As such, I respectfully ask you to be lenient in imposing any sentence on Mr. Suh that would impede his ability to move forward with his life and contribute to society. In particular ***I implore you to not impose any restrictions that will prevent him from utilizing his computer talents in a constructive manner. He has a bright future ahead of him in the technology sector.***

Letter from Eric Wittreich, attached hereto as Exhibit C.3.

Moreover, the fact that Mr. Suh's developmental disabilities limit his ability to earn a living to an occupation involving computers heightens the constitutional dimension of the proposed restriction. Forcing Mr. Suh to notify a future IT employer about a youthful mistake will effectively foreclose him from his most promising career option.

D. *The Need to Avoid Unwarranted Sentence Disparities*

We have found many cases with similar, and often more egregious, conduct that the Department of Justice and Courts have resolved through pretrial diversion or a misdemeanor plea agreement.

In *U.S. v. Roseanna* Pella, the defendant (age 47) worked as the Payroll Clerk for a plumbing and heating business. After Pella had worked for the company for over a year, her supervisor terminated her for failure to follow company protocol. Following Pella's termination, she remotely accessed her former employer's internal accounting system without authorization. She also breached multiple financial accounts belonging to the company, including its Internal Revenue Service ("IRS"), retirement system, and bank accounts. Once she accessed the accounts, Pella transferred $1,000,000 of the company's money from its bank account to the IRS. Pella then accessed the company's retirement system and changed the distribution of her former supervisor's 401(k). The Government charged Pella with one count of violating 18 U.S.C.

1030(a)(2), (a)(3) (Felony). She entered into a ***Pretrial Diversion Agreement that included 18 months of supervised probation, continued employment, and 500 hours of community service***. After successful completion of the terms of her probation, the Government dismissed the case. *United States v. Pella*, No. 06-MJ-00161 (D.N.V. Apr. 11, 2006).

In *U.S. v. Kristopher Rocchio*, the defendant (age 38), worked as a Vice President at a global financial services firm in New York City. A year after he left that firm for another Vice President role, Rocchio hacked into his former supervisor's email account with his prior company. The supervisor had never shared his password with Rocchio nor authorized him to use the account. Over the next two years, Rocchio illegally accessed the account over 100 times. He repeatedly stole confidential and proprietary information from his former employer, including internal financial documents and employee pay records. Rocchio also deleted messages from the account. The Government charged Rocchio with two counts: 18 U.S.C. 1030(a)(2)(C) and (a)(5)(B). He plead guilty to one count of 18 U.S.C. 1030(a) (Misdemeanor). The Court sentenced him to ***12 months supervised probation including 100 hours of community service and $40,000 restitution***. *United States v. Rocchio*, No. 16-CR- 00222 (S.D.N.Y. Mar. 18, 2016).

In *United States v. Teague*, 646 F.3d 1119, 1120 (8th Cir. 2011), the defendant was a Department of Education contractor that unlawfully accessed the student loan records of the President of the United States. She was convicted of a felony at trial. ***The Court sentenced her to two years of probation.***

In *U.S. v. Karen Hunter*, the defendant (age 62), a businesswoman with an MBA, repeatedly hacked into the email account of a business associate to steal confidential, proprietary information on a real estate project. Hunter, then a board member of a tribal gaming authority, used an overseas computer firm that specialized in "hacking" to create a sophisticated external

web portal framework that would allow her to repeatedly log into the victim's email account without being detected. The FBI's investigation showed that Hunter hacked into the email account on five to ten separate occasions as part of a calculated plan to steal confidential business information related to a billion-dollar casino development. She used the stolen information to give herself a personal advantage in negotiations within the Gaming Authority and to sabotage others involved in the project. Hunter plead guilty to one count of 18 U.S.C. 1030(c)(2)(A) (Misdemeanor). The Court sentenced her to ***three years of probation, including mental health treatment***. *United States v. Hunter*, No. 16-CR-00355-ARL (E.D.N.Y. Oct. 31, 2016).

In *Rossini v. United States*, No. 08-692 (JMF), 2014 WL 5280531, at *1 (D.D.C. Oct. 14, 2014), the defendant, an FBI employee, made over 40 searches of an FBI database for purely personal purposes, and not connected to FBI business. As a result, he was charged with violations of the CFAA. He was sentenced to 1) ***twelve months of probation for each of the five counts, to run concurrently;*** 2) a special assessment fee of $125; 3) a fine of $5,000 to be paid at a monthly rate of $250; and 4) 250 hours of community service.

In each of these examples, the nature and circumstances of the offense, coupled with the characteristics of the defendant, are far more egregious than in Mr. Suh's case. The defendants in the cases above are adult professionals, many with graduate degrees, who engaged in pre-meditated, calculated conduct, often for personal gain. Many of the cases also resulted in significant financial and other permanent harm to the victims. Even with those facts, the Government afforded all of them the benefit of pretrial diversion or probation.

These cases make clear that the facts and defendant characteristics in Mr. Suh's case are well within the parameters for probation under 18 U.S.C. 1030. In all but one of the cases above,

the conduct was calculated, pre-meditated, and part of an ongoing scheme (from several months to two years). The one case with impulsive acts similar to Mr. Suh's is *Pella*, in which the defendant received Pretrial Diversion. Similar to Mr. Suh, Ms. Pella, while in the midst of a difficult family situation, acted out of frustration toward her former employer, illegally accessing multiple accounts and wreaking havoc in the company's computer system. However, unlike Mr. Suh, Ms. Pella believed that her actions would cause serious and irrevocable financial harm to the victim in her case.

While it is difficult to compare facts among different cases, the intent, severity, and duration of Mr. Suh's conduct are all in line with, or significantly less than, the crimes cited above. Pleadings in many of the above cases cite mitigating characteristics of each defendant. We believe Mr. Suh's factors are even more compelling. At the time of his conduct, he was younger than all of the examples of defendants who received diversion or probation. Those defendants included a lawyer, a Master in Business Administration, and the Vice President of a finance firm. Mr. Suh, in contrast, is a college student with significant mitigation related to his background and offense conduct.

E. *The Need to Provide Restitution to the Victim*

As confirmed by both the Plea Agreement and Presentence Report, Mr. Suh, through counsel, proactively reached out to The Corp to offer to reimburse them for any expenses incurred as a result of his actions. The Corp's counsel indicated that the organization had incurred $5,980 in fees to a private cybersecurity firm and additional costs in student time spent on troubleshooting the technical issues. Mr. Suh reimbursed The Corp in full, with a check for $10,695.62, and has therefore already satisfied the goal of restitution to the victim.

F. *The Purposes of Federal Sentencing*

As noted at the outset, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence within the statutory penalty range. The sentence must be "sufficient, but not greater than necessary" to serve those purposes. With these guideposts in mind, Mr. Suh respectfully asks the Court to apply a downward variance from the advisory Guidelines range and to sentence him to a term of one year of supervised probation.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As discussed above, Mr. Suh understands that he committed a serious offense. As a law-abiding citizen and Eagle Scout, Mr. Suh's conduct was completely out of character. He feels great remorse for his actions, and the stress he caused his fellow students at The Corp.

The Court's task is to arrive at a "just punishment" for Mr. Suh's offense. A "just" punishment must take account of the facts that Mr. Suh's offense was isolated, not premeditated, and did not involve any financial gain. In the unique circumstances of this case – where an otherwise exemplary young man turned to a troublesome prank to communicate his frustrations with his fellow students – justice can and should be achieved through a sentence that spares Mr. Suh incarceration.

The Court may also consider the impact of its sentence on Mr. Suh and the fact that Mr. Suh has been punished greatly already. He had to withdraw from Georgetown University and has put his college degree on hold. He has already been punished through having to withdraw and resign from the things he cared most about. As his girlfriend explains:

> I have seen firsthand how this incident has affected him. After the FBI came to our apartment, he began to fully understand the consequences of his actions. I watched him send emails to professors saying he could no longer work as their teaching assistant. I watched him resign from his job at Ridgeline. I watched him

> email his Dean to withdraw from school. He had to give up so much because of his immaturity. He feels immense regret for what he has done, and I see how disappointed he is with himself.

Letter from Mr. Suh's girlfriend, Kayla Garrett, attached hereto as Exhibit B.1 Even more devastating, at age 23, he will have to live the rest of his lifetime as a convicted felon.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct." That goal also would be fully served by a probationary sentence in Mr. Suh's case. As stated above, Mr. Suh is young, with no prior record, he will now forever pay the price for his immature, thoughtless actions by being branded a federal felon. That is substantial deterrence for any other college student considering any type of cybercrime.

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant." The record in this case solidly demonstrates that Mr. Suh poses no threat of recidivism. Before his arrest in this case, Mr. Suh had no contacts at all with the criminal justice system. *See, e.g., Huckins*, 529 F.3d at 1318-1319 (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"). Mr. Suh is deeply ashamed by the behavior he briefly engaged in. He will not repeat it. Mr. Suh has effectively served one year of *de facto* probation and fulfilled all conditions.

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner." As acknowledged in the Presentence Report and Mr. Suh's psychiatric evaluation, his diagnosis of Joubert Syndrome has a significant impact on his physical and emotional health. The one positive aspect of this case for Mr. Suh is that it has led him, for the first time in his life, he has

engaged in psychotherapy to address the delays in his emotional development. Mr. Suh continues to meet regularly with Jason Nicholsen, LICSW.

> According to Mr. Nicholsen, ***particular focus has been placed on learning strategies for managing frustration and anger, coping with disappointment, and learning to align his emotional state with others as a way of attaining empathy. In each of these tasks, Mr. Nicholsen reported that Mr. Suh has made substantial progress.*** In fact, Mr. Nicholsen was able to provide several specific examples of situations that have arisen in Mr. Suh's life in the last several months that pertain to each of these three goals and how he has successfully addressed these situations. In addition, Mr. Suh has consistently completed homework assignments given to him as part of his psychotherapy. ***As a result of this work, Mr. Suh now initiates conversations about how he is feeling about various events, and thinks through different ways to express frustration and anger and how each of these might impact others, ultimately being able to consider what outcomes would likely result.***

Update to Psychological Report by Dr. Michael Hendricks (April 4, 2019), Exhibit A.2 (emphasis added).

Under a probationary sentence, Mr. Suh would be able to continue with all of the progress that he has made in psychotherapy, while continuing to balance his part-time job, volunteer work, and resuming his college studies. Interrupting Mr. Suh's course of treatment would run directly against one of the four goals of federal sentencing: that a defendant receive "needed . . . medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). *See, e.g.*, *Duhon, supra*, 541 F.3d at 395 (upholding probationary sentence where district court based sentence in part on finding that defendant would benefit most from continuing his psychological treatment with his treating doctor).

The past ten months have served as a *de facto* probation for Mr. Suh, during which he has already completed the usual conditions that would be ordered by the Court. A brief sentence of unsupervised probation for this defendant is fully consistent with the Court's statutory mandate to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of

federal sentencing. As eloquently stated in the letter of support from Mr. Suh's Pastor, Reverent Eusun Kim:

> At the end of the day, this is just the beginning of Justice's life. He is intensely passionate about computer science and about computer programming, and he is incredibly talented in ways that very few people are. He has learned important lessons about personal responsibility and accountability and mature responses to dealing with others. He has also learned the seriousness of the computer skills that he possesses and the need to apply them with prudence and wisdom. These are essential and valuable lessons, and I am glad that he was able to learn them, even if the personal costs were so much higher than I thought he deserved.
>
> I am a strong believer in forgiveness and redemption, and I pray that Justice will be given the opportunity to show what he is truly capable of, as a computer science engineer and as a human being. I hope that you will see his remarkable strengths and his enduring potential and give him the best chance for a future.

Letter of Reverend Eusun Kim, attached hereto as Exhibit A.4.

## CONCLUSION

**WHEREFORE** based on the foregoing reasons and any others that may appear to the Court, Justice Suh respectfully submits that a sentence of a brief term of unsupervised probation is sufficient, but not greater than necessary, to comply with the purposes of federal sentencing set forth in 18 U.S.C. § 3553(a).

Date: April 5, 2019 Respectfully submitted,

/s/ Lisa Manning
Lisa Manning
*Attorney for Justice Suh*
Schertler & Onorato, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC 20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
Email: LManning@SchertlerLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Kamil E. Shields, Esq.
Charles J. Willoughby, Jr., Esq.
Assistant United States Attorneys
United States Attorney's Office for the District of Columbia
555 Fourth Street, N.W.
Washington, DC 20001

/s/ Lisa Manning
Lisa Manning
*Attorney for Justice Suh*
Schertler & Onorato, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC 20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177